Liem Duc NGUYEN, Minh Cong Ha, Kim Chi Thi Lam, Dzu Thuy Do, Tan Huy Nguyen, Vul Van Le, Individually and On Behalf of All Persons Similarly Situated, Appellants,

v.

The UNITED STATES CATHOLIC CONFERENCE d/b/a The Southeast Asia Refugee Resettlement Office in Pittsburgh and Frank Chinh Nguyen, Individually and in His Capacity as Supervisor and Director of the Southeast Asia Refugee Resettlement Office of Pittsburgh, and Their Agents, Employees, Successors in Office, and all other persons acting in Consort or Cooperation with Them or at· Their Directions or Under Their Control, Appellees.

No. 82–5683.

United States Court of Appeals, Third Circuit.

Argued Sept. 15, 1983.

Decided Oct. 12, 1983.

Timothy P. O'Brien (argued), Daniel L. Haller, Neighborhood Legal Services Assn., Pittsburgh, Pa., for appellants.

James H. McConomy (argued), Mark D. Speaker, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Wilfred R. Caron, Gen. Counsel, U.S. Catholic Conference, Washington, D.C., for appellees; Angelo Aiosa, Asst. Gen. Counsel, New York City, United States Catholic Conference, of counsel.

Before SEITZ, Chief Judge, and HUNTER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM.

This case requires us to better define the relationships among recently settled refugees, a private charitable organization, and the federal government. Because we believe the United States District Court for the Western District of Pennsylvania correctly decided each of the three issues before it, 548 F.Supp. 1333, we affirm.

### I.

For almost half a century, the Roman Catholic Church in the United States has provided financial assistance and a variety of other services to refugees seeking better lives here in America. Until 1962, the federal government played no significant role in helping either refugees or the organizations that devoted their energies to helping refugees. In the aftermath of the Cuban Missile Crisis, however, Congress passed the Migration and Refugee Assistance Act of 1962, 22 U.S.C. § 2601 et seq., essentially an appropriations bill. Since then, the federal government has become active in providing

grants to agencies that continue to help Cuban and, after 1972, Ugandan refugees begin new lives here in the United States.

With the collapse of the South Vietnamese government in 1975, thousands of Indochinese refugees sought to flee to America. Congress therefore enacted another appropriations bill, the Indochina Migration and Refugee Assistance Act of 1975, which authorized the Government to contract with agencies such as the United States Catholic Conference (U.S.C.C.) to continue their aid to refugees. The grant agreements initially amounted to a reimbursement of $500 per capita to the agencies to help defray the costs incurred in resettling the refugees and to cover the costs of organizational overhead. Although the actual cost of settling each refugee varied, on the average it was at least twice this amount. To clarify the growing misapprehension that the government grants required direct cash payments to refugees, on February 24, 1976, the State Department issued a statement explaining that "there is no requirement that this be done. The fact of the matter is that no refugee is entitled to a total of $500 or to any specific amount of direct financial assistance."

Plaintiffs are six Indochinese refugees who were sponsored into the United States by U.S.C.C. between 1975 and 1979. Each settled in the Pittsburgh area, and each requested support from defendant Frank Chinh Nguyen, director of the Pittsburgh U.S.C.C. office. The district court found that (1) plaintiff Liem Duc Nguyen received $288 for rent and security deposit, and obtained three jobs through U.S.C.C.; (2) plaintiff Minh Cong Ha was refused reimbursement for a $429 television set; (3) plaintiff Kim Chi Thi Lam received $790.41 for herself and her three siblings; (4) plaintiff Tan Huy Nguyen received no assistance from the Pittsburgh office; (5) plaintiff Dzu Thuy Do received no assistance from the Pittsburgh office; and (6) plaintiff Vui Van Le was refused reimbursement for a $210 radio/cassette and a $75 watch, and received no financial assistance from the Pittsburgh office.

Plaintiffs then instituted a class action alleging that the defendants had deprived them of the equal protection and due process due them under the fifth amendment, denied them rights granted under the Refugee Acts, and that the defendant U.S.C.C. breached its contracts with the federal government, of which plaintiffs purport to be third-party beneficiaries. Plaintiffs sought monetary and injunctive relief.

In an exhaustive opinion, the district court concluded that plaintiffs' fifth amendment claim must be dismissed because nothing defendant had done constituted governmental action. With regard to the statutory claim, the court concluded that plaintiffs lacked a private right of action under the Refugee Acts. Finally, the court rejected plaintiffs' contention that they should be considered third-party beneficiaries of the grant agreements between the federal government and U.S.C.C. Plaintiffs thereupon appealed.

## II.

### A.

The limitations of the fifth amendment restrict only federal governmental action and not the actions of private entities. *Public Utilities Commission v. Pollak,* 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952). Given this fundamental principle of constitutional adjudication, the district court properly applied the criteria identified in the Supreme Court's recent decisions on state action to find no federal action in this case under the fifth amendment. *See Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) ("the purpose of the requirement is to assure that constitutional standards are invoked only when it can be said that [the government] is *responsible* for the specific conduct of which the plaintiff complains."); *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The defendants' activities here simply do not con-

stitute federal action within the meaning of the fifth amendment.

### B.

The Supreme Court has observed that "[t]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1952, 60 L.Ed.2d 560 (1979). Even were we to assume, therefore, that the defendants have violated the Refugee Acts, plaintiffs still must demonstrate that they are entitled to bring suit. The district court, applying the factors enumerated by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and refined in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), concluded that the plaintiffs failed to meet their burden. We agree. The Refugee Acts, essentially appropriations bills, do not expressly create a private cause of action. Nor does the legislative history offer any evidence whatsoever to support the contention that Congress intended courts to infer a private right of action. Such findings usually close the inquiry. *See Touche Ross & Co. v. Redington, supra* at 575–76, 99 S.Ct. at 2488–89. *Patentas v. United States,* 687 F.2d 707, 711 (3d Cir.1982). Even were we to pursue the analysis one step further, however, we would be forced to conclude that the very purpose of the Refugee Acts would be undermined by permitting private rights of action to emerge out of acts of charity. For the Acts are designed to ease the burdens of organizations that traditionally devote enormous time and money to help others. Exposing such organizations to unending suits from dissatisfied refugees hardly eases their burden. The district court thus properly dismissed the statutory claim.

### C.

The first and second Restatements of Contracts, although written half a century apart, echo a consistent theme on the issue of beneficiaries of government contracts:

§ 145. BENEFICIARIES UNDER PROMISES TO THE UNITED STATES, A STATE, OR A MUNICIPALITY.

A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

(a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences . . . .

Restatement of Contracts at 173 (1932).

§ 313. GOVERNMENT CONTRACTS

(2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

(a) the terms of the promise provide for such liability;  or

(b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

Restatement (Second) of Contracts at 472 (1981).

We see no reason to depart from the considered judgment of the Restatements. Plaintiffs point to no provision of the grant agreements that reflects the notion that U.S.C.C. will be liable to refugees should it fail to perform. *See Pennsylvania v. National Association of Flood Insurers,* 378 F.Supp. 1339 (M.D.Pa.1974), *modified on other grounds,* 529 F.2d 11 (3d Cir.1975);

*Schell v. National Association of Flood Insurers,* 520 F.Supp. 150 (D.Colo.1981). The district court thus properly held that plaintiffs could not be considered third-party beneficiaries of the grant agreements.

### III.

For many generations this nation has proudly and generously opened its doors to peoples from every corner of the globe who have sought to begin new lives here in America. Our decision today in no way reflects a diminished concern for the plight of refugees. Rather, we hold only that nothing in the fifth amendment, the Refugee Acts, or the relevant grant agreements suggests that we should circumscribe the discretion of an organization that has worked long and hard to reduce the pains of resettlement for thousands of members of our diverse American community.

The judgment of the district court will be affirmed.[1]

---

1. In light of our disposition of this case, plaintiffs' motion to remand to the district court for modification of the record is moot and is therefore dismissed.